**RATHBORNE LAND COMPANY, L.L.C.**          **CIVIL ACTION**

**VERSUS**                                  **NO. 05-2452**

**ASCENT ENERGY, INC., ET AL**              **SEC. "B"(3)**

### OPINION

Rathborne Land Company, LLC ("Rathborne") filed this mineral lease cancellation suit involving property located in St. Charles Parish, Louisiana.[1] Defendant mineral leasees are Ascent Energy, Inc. and Ascent Energy Louisiana, LLC ("Ascent").

Rathborne alleges that Ascent failed to produce the mineral lease in paying quantities and that Ascent is a bad faith possessor of the leased acreage, citing Louisiana Civil Code Articles 487 and 488. In denial of those allegations, Ascent asserts it was prudent and reasonable in its evaluations and handling of exploration and development opportunities from the acreage covered by this mineral lease.[2]

---

[1] The Heirs of Lydia Bergeron, Wife of/and Sidney Simoneaux Family Minerals Partnership, etc. and Marguirite McWilliams in her capacity as Trustee of St. Charles Land Trust settled all claims with Defendant post-trial, involving two other mineral leases on adjoining properties.

[2] Ascent also defended this matter by contesting, among other things, that Rathborne did not give proper notice for development under La. R.S.: 31.135/156. In pretrial and trial rulings Ascent's motions respecting the Rathborne plaintiff were denied.

In 1952, Joseph Rathborne Land & Lumber Company, Inc., as lessor, granted an oil, gas and mineral lease in favor of the California Company (later known as Chevron USA, Inc.) as lessee, which lease is recorded in the records of St. Charles Parish, Louisiana. Plaintiff Rathborne is the successor-in-interest to Joseph Rathborne & Lumber Company, Inc., and is the current lessor under the mineral lease at issue. The original lease covered 5,729.77 acres, but as a result of certain releases, currently covers 449.5 acres of land. Sometimes in 1992, Foreman Petroleum Corporation (Foreman) acquired lessee interests in the mineral lease. Following a Bankruptcy Court approved reorganization plan, a majority of the stockholders of Foreman organized a new corporation, Ascent Energy, Inc. in January 2001. In March 2001 Foreman acquired all outstanding shares of Ascent Energy, Inc.'s common stock from Foreman's majority stockholders in exchange for $1,000 cash. In July 2001, Foreman was restructed as a holding company and contributed to Ascent Energy, Inc. all of its assets and liabilities. Shortly thereafter, Foreman assigned all right, title and interest in and to the subject mineral lease to Ascent Energy, Inc., which assignment is recorded in the records of St. Charles Parish, Louisiana. In 2004, Ascent Energy, Inc. assigned all right, title and interest in the subject mineral lease to Ascent Energy Louisiana, LLC, which assignment is recorded in the records of the latter Parish and State.

Since the 1952 inception of this mineral lease, three wells were successfully drilled and completed on the Rathborne acreage, with only one well still in service prior to this lawsuit - the so-called Rathborne No. 2 Well. Between 1998 and 2001, Foreman performed six workover operations[3] on two of the Rathborne wells, with most of that work occurring in 1998. The Rathborne No. 2 Well was the only producing well as of the year 2000. It was reworked that same year to reestablish gas production from the same zones in which re-completion occurred nearly a year earlier. Since Ascent's initial 2001 involvement as lessee here, its August 2005 attempt to rework Rathborne No. 2 Well was precipitated by the filing of the instant lawsuit in May 2005. The noted rework effort was interrupted by Hurricanes Katrina and Rita. On December 1, 2005 the Rathborne No. 2 Well was reworked and recompleted as a gas well on the Rathborne leased acreage, following approximately 35 consecutive months of operational losses at a total cost to Ascent of over $280,000. Prior to that workover operation, by letter dated November 18, 2002, Rathborne notified Ascent of an alleged breach of exploration and development covenants in the lease, effectively putting Ascent in default.[4] In response, Ascent offered to release part of the leased acreage, 146 acres, that it held

___

[3] Workover operations are generally regarded as a attempt to restore or increase production from the zone(s) in which the well is currently producing, or from a new zone.

[4] Record Document Nos. 137 and 193.

under the Rathborne lease in exchange for recognition of a right of way. Rathborne refused and demanded a release of all non-producing acreage. In response to its lessors demands, Ascent, for the first time, solicited bids in 2004 or 2005 from three geophysical companies to conduct a seismic shoot over the leased acreage.[5] Later, in March 2006 Ascent entered into an option agreement with Seismic Exchange, Inc. (SEI) to conduct a 3-D geophysical survey (Gheens Survey). In return for allowing SEI the right to conduct the survey, Ascent had a "right to review" the survey data for two years following its final processing. Ascent did not agree to pay for any portion of this seismic shoot. In the Summer of 2006, Ascent ceased all production on Rathborne No. 2 Well. Subsequently on April 20, 2007, Ascent released the Rathborne lease after receiving a March 2007 letter from Rathborne's counsel, again demanding release of the lease. Interestingly, in a January 26, 2007 filing Ascent states "The SEI survey may disclosure additional opportunities." Record Document 152. The SEI shoot was completed prior to the February-March 2007 trial date.

In Louisiana, the lessee's obligation to act as a "good

_____

[5] According to Ascent's Mark Haney, a seismic survey or shoot is a tool that provides either two (2D) or three (3D) dimensional imagery of subsurface areas in order to detect possible mineral deposit locations. Data collected from a seismic survey is studied and interpreted, usually by geologists. While not an exact art, seismic studies help minimize the risk of drilling a dry hole - a non-productive well.

administrator" or "prudent operator" under LA. R.S. 31:122[6] exists in five situations: (I) The obligation to develop known mineral producing formations in the manner of a reasonably prudent operator; (ii) the obligation to explore and test all portions of the leased premises after discovery of minerals in paying quantities in the manner of a reasonably prudent operator, (iii) the obligation to protect the leased property against drainage; (iv) the obligation to produce and market minerals discovered as a reasonably prudent operator; and (v) the obligation to restore the surface of the lease premises on completion of operations. Under Louisiana law, lease cancellation, including partial lease cancellation, is an extremely harsh and rarely granted remedy. *Rivers v. Sun Exploration & Production Co.*, 559 So.2d 963, 968 (La. App. 2d Cir. 1990).

In defining reasonable development obligations under La. R.S. 31:122, the issue evolves into matters of factual circumstances, reasonable and diligent efforts, industry standards and prudent operators. *Frankel v. Exxon Mobil Corp.*, 923 So. 2d 55, 62 (La.

---

[6] La. R.S. 31:122 provides:
§ 122. <u>Lessee's obligation to act as reasonably prudent operator</u>
A mineral lessee is not under a fiduciary obligation to his lessor, but he is bound to perform the contract in good faith and to develop and operate the property leased as a <u>reasonably prudent</u> operator for the mutual benefit of himself and his lessor. Parties may stipulate what shall constitute reasonably prudent conduct on the part of the lessee. (Emphasis added)

App. 1st Cir. 2005).

Under LA. R.S. 31:122, Ascent's conduct is evaluated by what is expected of ordinary persons of ordinary prudence under similar circumstances and conditions having due regard for the interest of both contracting parties. *McDowell v. PG&E Resources Company*, 658 So.2d 779, 784 (La. App. 2d Cir. 1995).

In determining whether Ascent has reasonably developed the leased property, a court considers Ascent's entire operations and measures taken for future development. Relevant factors include (I) geological data, (ii) number and location of wells drilled, (iii) productive capacity of wells, (iv) cost of drilling operations compared to profits, (v) time interval between completion of the last well in demand for additional operations, and (vi) acreage involved in the dispute. *Vetter v. Morrow Oil Company*, 361 So.2d 898, 900 (La. App. 2d Cir. 1978); *Noel v. Amoco Production Company*, 826 F. Supp. 1000, 1011 (W.D. La. 1993). A mineral lessee is <u>not</u> required to drill unprofitable or unnecessary wells. *Coyle v. North American Oil Consolidated*, 9 So. 2d 473, 478 (La. 1942).

After the discovery of oil or gas, Louisiana law imposes upon the mineral lessee a general duty to further develop all known productive sands underlying the leased premises in the same manner as a reasonably prudent operator would develop the lease. *Wadkins v. Wilson Oil Corp.*, 6 So. 2d 720 (La. 1942); *Vetter v. Morrow,*

*supra*. After production has been obtained, the law generally requires the lessee to reasonably test and explore undeveloped portions of the leased premises in an effort to obtain additional production, the so-called exploration obligation. *Sohio Petroleum Co. v. Miller*, 237 La. 1015, 112 So. 2d 695 (1959); *Carter v. Arkansas Louisiana Gas Co.*, 213 La. 1028, 36 So. 2d 26 (1948).

In cases like the present one, the lessor Rathborne bears the burden of proving that its lessee Ascent has failed to sufficiently develop and explore the leased property from a consideration of the facts and circumstances shown in this particular case. *Carter*, *supra*, at p. 28. The lessor's burden is met by showing there is reason to believe that diligent investigation of the leased premises might disclose the presence of potentially profitable oil and gas deposits and that the lessee refuses or has persistently failed to reasonably investigate such possibilities. *Carter*, *supra*; Harrell, *A Mineral Lessee's Obligation to Explore Unproductive Portions of the Leased Premises in Louisiana*, 52 La. L. Rev. 387, at 400 (1991) (citing *Carter*, *supra*).

Considering applicable law, the facts and circumstances in this case convinces the Court that Rathborne has met its burden of proof by presenting more credible facts, tending to show that a reasonably prudent operator would have investigated the leased premises by conducting a seismic survey that might have disclosed the presence of potentially profitable oil and gas deposits.

Moreover, Ascent and Foreman repeatedly failed and refused to participate in such surveys, or to conduct their own proprietary survey, without credible reason, all in breach of their express and implied lease obligations to reasonably develop and explore the Rathborne lease.[7] Despite the trial testimony of Mark Haney, Robert Barton, David Mc Cabe and Richard Green that no further exploratory or development operations were warranted, Ascent refused since the 2002 demand letter to farmout[8] any part of the acreage to interested third parties for geological surveys. It is the lessee's obligation to reasonably explore and develop leased premises, not the lessors. *Carter*, *supra*. Ascent's witnesses testified there were neither farmouts nor any effort to interest third parties in taking a farmout by the Forman or Ascent lessees. (See Haney trial testimony and Harold Block Deposition, at p. 83, lines 15-19; p. 85, lines 24-25; p. 86, lines 1-5 and 23-25; p. 87, lines 1-5; p. 95, lines 2-7) The evidence further convinces us that Forman and Ascent did not conduct or reasonably seek to

---

[7] This Court considers as relevant evidence the lessees activities occurring both before and after the lessor's November 2002 default letter. Art. 136, La. Mineral Code; Order at Record Document No. 132; *Noel v. Amoco*, 826 F. Supp. 1000, 1011 (W.D. La 1993); Undisputed fact that Ascent Energy, Inc. at all relevant times is the wholly - owned subsidiary of Foreman, whose key decisions on development and operations were made by the same persons, e.g. Harold Block, et al.

[8] Farmout is a term used when the lessee contracts with third parties to do develop and/or exploratory work on underdeveloped areas of the leased premises.

conduct exploration activity on the Rathborne lease, with the last such activity occurring prior to March 1999. The only development activity by Ascent was a rework in 2005 of the one existing well, the Rathborne No. 2 Well. That rework effort started about three months after the May 2005 filing of this lawsuit and over three years after the November 2002 demand/default letter from Rathborne. Further, the testimony of Mark Miller, Greg Lier and John Bernhardt provided convincing evidence that effectively refuted Ascent's denials of ever being approached in 2001 about a proposed seismic shoot that would have included the Rathborne lease acreage. Miller gave extensive testimony on his direct involvement with Forman's and Ascent's executive/landman, Harold Block, concerning the proposed Dominion shoot. The Court was impressed with Miller's recollection of detailed discussions with Block and McClain Forman. Miller described meeting with Forman's Bankruptcy Committee, along with Block, in Forman's New Orleans office. He offered to include the acreage held by Forman in the 3D seismic shoot at no cost to Forman, with Forman having the right to review the seismic data for free and an option to license it for a fee. Forman refused. Miller made another attempt to seek Forman's permission to include the leased acreage in the seismic shoot, but Block told Miller that once again Forman declined the offer. After the 2001 restructuring of Forman as the holding corporation of Ascent, Miller again sought permission to include the leased acreage in the Dominion shoot;

again, Block reiterated his company's refusal.  At trial, Ascent contended a seismic shoot was not economically feasible.  However, about four years after their lessor's demand letter and about one year after the filing of this case, Ascent agreed in March 2006 to allow an entity known as SEI to conduct a 3D seismic survey over the Rathborne leased acreage and other areas - collectively referred to as the Boutte Field.  Notably, the terms of the 2006 SEI survey agreement with Ascent are very similar to the terms of the 2001 Dominion survey proposed by Miller and rejected by Forman and Ascent.  By trial date, the SEI survey had been conducted with no indication from Ascent whether it was going to use or purchase the data collected from that 3D survey.  Ascent's Senior Geologist Robert Barton testified that several, perhaps four proposals for seismic tests were received by the company, but no action was taken to accept them.  He further testified that without 3D data, Ascent had no intention to do deeper (exploratory) drilling.  Deferring to David McCabe, Ascent's Mark Haney testified he had no idea why Ascent did not try to organize a 3D survey prior to this lawsuit. Ascent's Chief Operating Officer David McCabe acknowledged that the lack of seismic data inhibits development of mineral leases.  He admitted that Ascent had seismic data for all of its other fields with mineral leases, but no such data for the Rathborne leased acreage.  Ascent's Richard Green testified that defendant held the Rathborne lease for nothing more than speculative reasons.

Given above evidence and the totality of circumstances of record here, Forman and Ascent failed to provide credible evidence to warrant belief in their "business decisions" to forego participation in the Dominion 3D survey. Additionally and without credible reason, Ascent failed to even obtain two dimensional (2D) seismic data over the subject acreage despite the long-standing availability of such data. Compounding their unreasonable failures to explore, Ascent also failed to be prudent developers by holding onto the Rathborne No. 2 Well's 40 acres and the entire 449.5 acres under lease for purely speculative reasons until the eve of trial. In sum, and based upon credible trial evidence of record, Ascent has persistently failed to fulfill its statutory and contractual obligations, express and implied, to reasonably explore and develop the Rathborne lease by failing to participate in a 2D survey, failing to pursue farmouts, failing to timely participate in a 3D study that might have disclosed the presence of potentially profitable oil and gas deposits and failing to release retained acreage with a well having little or no meaningful production for almost a year. Rathborne has met their burden of proof by showing that a reasonably prudent operator would have investigated the undeveloped portions of leased premises, in this particular case, by participating in the foregoing work. Rathborne, as lessor, is under no obligation to prove the actual presence of potentially profitable mineral deposits; nor is the lessor required to present

the lessee with seismic or farmout proposals. It is Ascent's responsibility as lessee to reasonably pursue exploration and development of leased acreage. In this regard, it has failed without credible explanation for its actions.

The 3D survey proposed by SEI and agreed to by Ascent in 2006 could and should have been done years ago on at least one of four prior opportunities: (1) In 1995, when Forman refused to participate in a 3D survey with Burlington Resources, Inc.; (2) In 1998, when Forman refused participation with Watson Energy, Inc.; (3) In 2000, when Forman refused to participate in the 3D survey proposed by Dominion; or (4) In 2001, when Ascent declined participation in the noted Dominion shoot despite being given another opportunity to do so. (Credible testimony from John Bernhardt and Mark Miller)

Ascent failed to present convincing testimony to justify its persistent refusals to participate in any of above seismic surveys, most of which were eventually conducted over separate lands involving different mineral leases and with prudent lessees. Had Ascent acted prudently by participating in a seismic survey years ago, Rathborne would have had use of the seismic fees that SEI ultimately paid Rathborne to shoot their acreage in the Boutte Field. Given above circumstances, it is most probable that the seismic study would have occurred within one year after the Rathborne's 2002 default/demand letter. Because the Rathborne

leased acreage is in the core or center area of the Boutte Field, convincing evidence establishes that, absent seismic survey over the leased acreage, the remaining non-leased periphery or corners of the Boutte Field would not be suitable for meaningful seismic study. (Credible testimony of SEI's Tim Moran and Mark Miller) Ascent knew or should have known that the entire Boutte Field, including the leased core area, was needed for inclusion into the seismic survey - as further evidenced by the one survey Ascent agreed to in 2006, the SEI shoot.  The latter survey included 5,834 acres owned by Rathborne in the Boutte Field, including the Rathborne leased acreage at issue of 449.5 acres.

Rathborne received in 2006 $291,700 as seismic fees from SEI, based on $50 per acre multiplied by 5,834 acres. (Exhibit 98)  The time value of money lost, or lost simple interest, on the $291,700 had it been received in 2003 (one year after the 2002 demand letter)instead of 2006, computes to $43,755, using a conservative rate of return of 5% per annum.  The Court is convinced by the evidence that leasing opportunities more probably than not generally existed between 1995 through 2006 and that leases were executed in similar fields in the area during the same period of time.  Damages for lost profits must be proven to a reasonable certainty and must not be based on evidence that is speculative or conjectural.  *Frankel v. Exxon Mobil Corp.*, 923 So.2d 55, 64 (La. App. 1st Cir. 2005); Thomas Harrel, *supra*, 52 La. Law Rev. 387.

The trial record established that it is customary in the oil and gas industry at the time of acquiring a seismic permit to also obtain an option to lease the land subject to the seismic permit. The lease option would allow the option holder to drill a well if the seismic data indicated mineral prospects. (Miller, Bernhardt and Moran) Rathborne's related companies in nearby and similarly situated oil and gas fields, on numerous occasions received substantial revenue from multiple mineral lease payments arising from the grant of seismic permits. (Lier and Exhibits 119 through 141) After a 3D shoot over Rathborne's West Barataria Bay Field in 1996, Rathborne granted about six successive mineral leases in this field, including a few new wells, generating about $1.7 million during the last ten years. (Lier; Exhibits 126, 127, 128 and 129) Rathborne Exhibits 126, 128 and 129 show, by example, a seismic permit and mineral lease option that generated seismic fees of $50 per acre plus mineral lease option revenue of $250 per acre. Once that lease expired, Rathborne leased the same acreage again to another entity in March 2001, yielding more lease rental revenue of $250 per acre. (Exhibits 133-134) Rathborne's Greg Lier also referred to similar experiences in the Parishes of St. James, St. John and Lafourche, Louisiana.

The Dominion proposal would have produced seismic fees and lease option income for Rathborne during a 2002 to 2003 inclusive time frame but for Ascent's refusal to participate in that seismic

proposal. Ultimately, as noted earlier, Ascent's participation in 2006 with the SEI survey produced revenue for Rathborne. In addition to seismic fees, Rathborne was due to receive from SEI/Castex lease revenue in 2006 in the amount of $250 per acre as a selection bonus plus annual rentals of $250 per acre for three years, and a 25% royalty. (Exhibit 98) To recover for lost leasing opportunities, the lessor must prove that it is "more probable than not" that it would have been able to lease their property had the lessee complied with its statutory duty to provide a timely release. *Chesapeake Operating, Inc., v. Richardson*, 884 So.2d 1263 (La. App. 3rd Cir. 2004); *Wood v. Axis Energy Corp.*, 899 So.2d 138, 148 (La. App. 3rd Cir. 2005).

This Court finds more probable than that Rathborne's property, if available for lease in 2002 or 2003, would have been attractive property for seismic permit and lease options, and would have brought a bonus of $250 per acre, plus rentals of $250 per acre for at least one year. Rathborne's lost leasing revenue amounts to $1,458,000 for the bonus payment, plus $1,458,000 for one rental payment.

Further, Rathborne made judicial demand for lease cancellation and damages based on Ascent's failure to produce the lease in paying quantities.[9] As stated earlier, Rathborne No. 2 Well was

---

[9] La. R.S. 31:124 defines production in paying quantities. Louisiana courts apply a standard here of whether or not, under all relevant circumstances, a reasonably prudent operator would,

operating at no or little meaningful production and was being held by Ascent for merely speculative reasons until almost the eve of trial preparations.  For that and other reasons noted earlier, Ascent's retention of acreage was not reasonable.  The Rathborne lease thereby terminated because of Ascent's failure to produce in paying quantities.  Ascent ceased to be a good faith possessor of Rathborne land no later than the date of judicial demand putting them on notice of the claim, February 14, 2006.  *Wood, supra*. Rathborne is entitled to an accounting and payment of the value of all production from Rathborne No. 2 Well, less royalties paid to date.  Through July 2006, the net revenue due Rathborne on production from this well amounts to $26,280.71, Exhibits 164-165, plus all revenue thereafter, less royalties, if any.

Rathborne is also entitled to an award of attorney fees in connection with its successful demand for dissolution of this mineral lease for Ascent's failures to comply with its obligations. La. R. S. 31:207 and 209.  In that regards, counsel for all parties shall confer no later than thirty (30) days after receipt of this opinion in an effort to reach a stipulation as to the amount of reasonable attorney fees and costs, reserving Ascent's right to

---

for the purpose of making a profit and not merely for speculation, continue to operate a well in the manner in which the well in question was operated. *Wood, supra; Lege v. Lea Exploration Co., Inc.*, 631 So.2d 716, 717, *writ denied*, 635 So.2d 1112 (1994).

contest entitlement to same on appeal. Otherwise, no later than February 10, 2009 Rathborne shall file and notice for oral/evidentiary hearing its motion for attorney fees and costs.

Given the findings in this opinion, the Court also denies on the merits all remaining claims, defenses and counterclaims asserted by Ascent for the foregoing analysis and reasons.

Lastly, final judgment on all awards and claims will issue after resolution of the remaining attorney fees and costs claim.

New Orleans, Louisiana this 31st day of December 2008

UNITED STATES DISTRICT JUDGE

-17-